**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| In re:  Case No. F05-01928-DMD<br><br>KELLY ANN KOCH, aka Kelly Rigo, aka Kelly Hall, fka Kelly Parker,<br><br>Debtor. | Chapter 7 |
| BETSY PARKER,<br><br>Plaintiff,<br><br>v.<br><br>KELLY ANN KOCH,<br><br>Defendant. | Adversary No. F05-90043-DMD<br><br>**Filed On**<br>**5/17/07** |

**MEMORANDUM DECISION**

This is an action for exception to discharge.  It is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I).  This court has jurisdiction pursuant to 28 U.S.C. §1334 and the district court's order of reference.  I find for the plaintiff.

Background

Plaintiff Betsy Parker was married to George Parker for thirteen years.  The debtor, Kelly Koch, is George Parker's daughter from a previous marriage.  George Parker passed away on March 21, 2005, after an extended illness.  In this adversary proceeding,

Betsy seeks to except from discharge two loans she extended to Kelly in the months before George's death.

Over the years, George had given his daughter financial assistance on several occasions. He helped her purchase a condominium when she was 23. He purchased the lot on which Kelly's house is located. He helped her with car payments. Kelly said the last time George personally lent her money was in 2002, when he paid roughly $8,000.00 in attorney's fees in connection with her divorce. Kelly said her father never asked her to repay him. She intended to, but something would always come up.

George had transferred most of his liquid assets to a trust. In March, 2004, George cut Kelly out of the trust. He made a third amendment to his trust agreement which provided for a token payment of $500.00 to Kelly and forgiveness of her debts to him.[1] The balance of the trust assets were to be held for the education of George's five grandchildren. Betsy said Kelly was aware of this change before she made the loans which are at issue here. According to Betsy, George changed his trust because Kelly hadn't saved her children's PFDs and he wanted to ensure that funds would be available for their education. Betsy also said George decided to change his trust after paying for Kelly's divorce, which had about depleted their bank account. Kelly maintains she didn't know about the third amendment to the trust until after her father's death.

---

[1] Kelly's brother received similar treatment under the third amendment to the trust.

2

Betsy testified that she extended loans to Kelly on two occasions in the months preceding George's death. On the first occasion, Kelly asked for money to make a house payment. Betsy signed a check drawn on a credit card account solely in her name for Kelly's use. She told Kelly she could use the check to make a house payment in the sum of $1,400.00. Betsy said Kelly made the check for $2,200.00, in violation of her instructions. Kelly testified that she didn't recall this loan. She hasn't repaid Betsy for any portion of this obligation.

On a second occasion, in December of 2004, Kelly approached Betsy for more money. Kelly had met with attorney Barry Jackson to discuss filing bankruptcy. She said that after her meeting with Mr. Jackson, she had concluded that filing bankruptcy would be a certainty. She needed $1,600.00 to pay Mr. Jackson's attorney's fees. She told Betsy that she needed to buy winter coats for her children plus $1,600.00 so she could pay her bankruptcy attorney's fee. Betsy gave Kelly an MBNA credit card.[2] The account was solely in Betsy Parker's name. Betsy told Kelly that she could make charges of up to $2,000.00 on the card, for the purpose of buying winter coats for the children and paying Mr. Jackson's legal fees.

Kelly didn't use the card to pay her legal fees. She testified that Mr. Jackson wouldn't accept a credit card for payment of his fees, so she instead paid him in cash. However, after receiving Betsy's card, Kelly racked up numerous other charges. She made

---

[2] This was a card Betsy had paid off. It had a zero balance at the time she gave it to Kelly.

3

10 charges totaling $1,366.61 in December of 2004, 23 charges totaling $3,976.26 in January of 2005, 7 charges totaling $748.32 in February of 2005, and 2 charges totaling $2,261.57 in March of 2005. Kelly charged more than just winter coats on the card. She purchased food for her dogs and paid vet bills and entry fees to show her dogs at dog shows. The last charge she made, on March 12, 2005, in the amount of $2,050.00, was for a custom-made wedding ring. This charge was made just 9 days before her father's death.

Kelly admitted that Betsy set a $2,000.00 limit on the card. She also conceded that the card was given to her expressly to buy coats for her children and pay legal fees. But Kelly said that after she met with Mr. Jackson a second time, he told her she needed to bring certain accounts current before filing bankruptcy. She said she discussed this situation with Betsy afterwards and Betsy told her to "just do what you need to do" with the credit card. Betsy denies ever making this statement. Kelly said she used the card to pay for living expenses and to bring some of her accounts current before filing bankruptcy. She also said she believed that, once the bankruptcy was behind her, she would be able to pay Betsy back.

George's health continued to decline during the period of time that Kelly had use of Betsy's credit card. Although Betsy became aware that Kelly had charged more than $2,000.00 on the card, she was so preoccupied with George's care that she didn't have time to deal with much else. On March 19, 2005, George collapsed at home and had to be hospitalized. Betsy and Kelly had a falling out regarding George's medical treatment while he was in the hospital. Betsy felt all life support should be terminated, consistent with George's living will. Kelly opposed Betsy's decision. She became very angry with Betsy's

4

decision to terminate life support. There was an unpleasant scene at the hospital and the relationship between the two women soured.

Shortly after George's death, Betsy asked Kelly to return the credit card. In addition to the $8,195.69 in charges Kelly made on the card through March 12, 2005, substantial finance charges and overlimit fees have accrued. Kelly has made only two small payments on the credit card; one for $15.00 in January, 2005, and a second for $125.00 in February, 2005. During the entire time that Kelly had use of the credit card, she was employed full time at Home Depot, earning roughly $2,000.00 per month.

Although George's trust provided for a payment of just $500.00 to Kelly, she nonetheless received a fairly substantial sum of money after George's death. George owned a cabin that was not included in the trust. Kelly and her brother also had an interest in the cabin. The cabin was sold in the summer of 2005. In July, 2005, Kelly received $36,877.48 from the sale proceeds. In an effort to have the credit card debt paid off before Kelly spent her share of the cabin proceeds, Betsy sued Kelly in state court and sought a prejudgment writ of attachment. On August 3, 2005, the state superior court initially required Kelly to deposit $11,000.00 into the state court registry. One week later, however, after a second hearing, the court found that Betsy hadn't met her burden of proof for a prejudgment writ, and ordered the funds released back to Kelly. The funds were returned to Kelly on September 16, 2005. She deposited them into her husband's checking and savings accounts. During the summer, Kelly transferred the remainder of the cabin proceeds from her bank accounts to her husband's, as well. She also paid her husband a total of $3,965.00 for

5

carpentry work he did around the house and watching the children over the summer while she worked.

Less than a month after receiving the funds back from state court, on October 14, 2005, Kelly filed for chapter 7 relief. Betsy filed a timely dischargeability complaint against Kelly on November 9, 2005. Trial of this matter was held on April 19, 2007.

Analysis

11 U.S.C. § 523(a)(2)(A) excepts debts from discharge when incurred by "false pretenses, a false representation, or actual fraud."[3] "This exception to discharge furthers the policy that an honest but unfortunate debtor obtains a fresh start while a dishonest debtor does not benefit from his wrongdoing."[4] A creditor must establish the following elements to prove fraud under § 523(a)(2)(A):

(1) [that] the debtor made the representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; [and]

---

[3] 11 U.S.C. § 523(a)(2)(A).

[4] *Citibank v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir. 1996), *citing Grogan v. Garner*, 489 U.S. 279, 286-87 (1991).

6

>     (5)    that the creditor sustained the alleged loss and damage as
>            the proximate result of the representations having been
>            made.[5]

A creditor's reliance on the debtor's representations must be justifiable.[6] The plaintiff must prove all the elements of its nondischargeability claim by a preponderance of the evidence.[7]

Two loans are at issue in this proceeding. Betsy will not prevail on the first loan because the evidence regarding this debt is limited and contradictory. Betsy testified in the state court action that she authorized Kelly to write a credit card check for $1,140.00 to make a house payment,[8] but told this court that she authorized a loan of $1,400.00. Betsy said Kelly exceeded the amount she had authorized for this first loan by writing the check for $2,200.00. No documentary evidence, such as a copy of the cancelled check or a credit card statement, has been produced with reference to this loan. Kelly testified in both state court and before this court that she didn't recall this first loan. Finally, Betsy testified in state court that, although she was shocked that Kelly had written the check for a sum substantially in excess of what had been authorized, she never said anything to Kelly or George about it.[9]

---

[5] *Eashai*, 87 F.3d at 1086, *citing Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsch (In re Kirsch)*, 973 F.2d 1454, 1457 (9th Cir. 1992).

[6] *Field v. Mans,* 516 U.S. 59, 74-75 (1995).

[7] *Grogan v. Garner*, 498 U.S. 279, 290 (1991).

[8] *See* Tr. of Proceedings, pp. 32-33 (attached to *Erratum to Pl.'s Opp'n to Mot. for Summ. J.*, filed Mar. 19, 2007 (Docket No. 21).

[9] *Id.*

7

She "let it slide" and paid the debt herself.[10] Given the paucity of evidence surrounding this loan, I cannot find that this debt was incurred by fraud on Kelly's part.

I do find, however, that Betsy has established the five elements required to prove fraud under § 523(a)(2)(A) with regard to the credit card debt. First, Kelly made representations to Betsy. She told Betsy she needed $2,000.00: $400.00 for her children's winter clothes and $1,600.00 in attorney's fees. Betsy gave Kelly a credit card and told her she could place charges of up to $2,000.00 on it for the limited purpose of buying winter coats and paying attorney's fees. Kelly doesn't dispute these facts.

Betsy relied on Kelly's representations. Kelly said she needed funds for specific purposes. Her requests seemed reasonable and necessary. Betsy knew George wouldn't loan Kelly any more money. She wanted to help her out if she could. Betsy also said that, even if Kelly didn't repay the $2,000.00 she authorized to be placed on her credit card, this was a sum she felt comfortable loaning Kelly because she knew she could pay this amount herself if need be.

I feel Betsy's reliance upon Kelly's representations was justifiable. Kelly had requested loans from George and Betsy numerous times in the past. The loans were for specific, necessary expenses, such as a car repair or a house payment. While Kelly never repaid these loans, she didn't ask for money to buy luxury items. Also, Kelly was signatory on George's bank account for years, even before Betsy married him, and had never taken

---

[10] *Id.*

8

money out of his account. She always requested a loan. Given this history, Betsy was justified in relying on Kelly's representation that she needed $2,000.00. She had no reason to think that Kelly would charge more than four times this amount on the credit card she gave her.

Betsy sustained a loss as a proximate result of Kelly's representations. Kelly exceeded the authorized limit Betsy had placed on the credit card by more than $6,000.00. Kelly has argued that Betsy could have cut off her use of the credit card or closed out the account long before the charges reached $8,000.00. This argument is meritless. First, Betsy's time during this period was devoted to George's care. Her husband was dying; she wasn't able to deal with Kelly's spending habits as well. Further, Kelly conceded she had only been authorized to use the card for $2,000.00 initially. Kelly never asked Betsy if she could exceed the amounts Betsy intended to loan her. Even assuming Kelly genuinely believed Betsy told her to "do what she needed to do," the amount of charges Kelly placed on the card are unbelievable. Kelly said she used the card to pay living expenses. But, the entire time she had use of the card, she was employed full time at Home Depot. She had funds to pay for basic living expenses. And there is simply no justification for Kelly's use of the card to show dogs, purchase expensive jewelry, or make home improvements at a time when she believed that filing bankruptcy was a certainty.

The remaining two elements of a § 523(a)(2)(A) claim are the most difficult to establish. Betsy must show that Kelly knew her representations were false and that she made the representations with the intent and purpose of deceiving Betsy. These elements are

often difficult to establish by direct evidence. But an intent to deceive may be inferred and established from surrounding circumstances.[11] I find there are several instances that point to Kelly's fraudulent intent. First, all the charges Kelly made on the credit card were during a period of time when she was certain she would be filing bankruptcy. She knew she didn't have the ability to pay the amounts she charged on the card. Next, Kelly used the card to charge items that Betsy hadn't authorized, and she went well over Betsy's $2,000.00 limit. In fact, Kelly concedes her wedding ring was a luxury item which she and her husband should have paid for. Additionally, Kelly made nominal payments on the card during the time she was racking up charges in excess of $8,000.00, essentially stringing Betsy along in the belief that the charges would eventually be repaid. Finally, when Kelly received the cabin proceeds, she refused to repay Betsy. Instead, she placed these funds into her husband's bank accounts. She also wrote her husband a check for $3,965.00 for carpentry work and childcare.

Kelly contends she put her money into her husband's accounts on the advice of a state court judge. Before she filed bankruptcy, creditor OSI had obtained a state court judgment against Kelly and seized funds from Kelly's bank account. At an exemption

---

[11] *Alexander & Alexander of Washington v. Hultquist (In re Hultquist)*, 101 B.R. 180, 183 (B.A.P. 9th Cir. 1989), *citing Bear Stearns & Co. v. Kurdoghlian (In re Kurdoghlian)*, 30 B.R. 500, 502 (B.A.P. 9th Cir. 1983). The Ninth Circuit has adopted 12 factors, "the *Dougherty* factors," to be considered in determining a debtor's intent when a credit card debt is involved. *Eashai*, 87 F.3d 1087-88. Those factors will not be used here because, although this case involves the use of a credit card, the debt at issue is essentially a two-party transaction between the debtor and creditor. The Ninth Circuit recently held that the *Dougherty* factors aren't applicable in these kinds of transactions. *See Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1086 (9th Cir. 2000).

10

hearing after seizure of Kelly's funds, the judge did suggest to Kelly that she not put funds into an account with her name on it if she didn't like to have her money seized.[12] However, the judge also told Kelly she needed to get the OSI judgment paid.[13] He wasn't suggesting that Kelly hide her assets so she would *not* need to pay her debts.

      Kelly's primary defense to Betsy's claim is that she believed the loans were from her father, not Betsy. Kelly said her father was always there to help her and she assumed that the credit card loan was also from him. Since her father forgave her debts in his third amendment to the trust, Kelly said she didn't think she had to repay the credit card debt. I don't find her argument credible for a number of reasons. First, Betsy's name was the only name on the credit card. There was no reason for Kelly to believe that Betsy would not be responsible for charges to her account. Second, George had lost patience with Kelly and cut her off prior to his death. He excluded Kelly as a trust beneficiary of his liquid assets. And when Kelly had the opportunity to make things right and repay Betsy with cabin proceeds, she refused to honor her obligations.

      Kelly also argued that Betsy had transferred the amounts she had charged onto a different credit card only in Betsy's name. This argument was also unpersuasive. Betsy testified that she and George had, between them, several MBNA credit cards. But the one that Betsy gave Kelly to use was in her name only, and Betsy has never transferred balances from other accounts to that card. The liability spreadsheets from George Parker's trust

---

[12] *See* Pl.'s Ex. 9, p. 35.

[13] *Id.*

11

administration support Betsy's statement. It appears that balances from other MBNA and Universal credit cards were transferred to an American Express card of Betsy's, but neither of the MBNA balance transfers exceeded $2,300.00.[14] Kelly had placed more than $8,000.00 on Betsy's card. The liability spreadsheet doesn't list an MBNA card with a balance of this size.

The circumstances surrounding Kelly's use of the credit card lead me to conclude that Kelly knew her representations were false and intended to deceive Betsy. Judgment will be entered in Betsy's favor, as to the credit card debt. At trial, Kelly admitted she had incurred charges on Betsy's card (including interest and overlimit fees) in the sum of $9,264.80.[15] This is the sum total of all charges incurred through July 22, 2005. Because Betsy authorized Kelly to charge up to $2,000.00 on the credit card, this amount is dischargeable and will be deducted from the total of Kelly's charges. The balance of $7,264.80 will be excepted from discharge, plus the additional interest that has accrued on this sum, in the amount of $3,173.83. Interest is calculated from July 22, 2005, through the date this memorandum decision is entered, at the rate of 23.99% per annum as charged on the credit card.[16] Post-judgment interest will be awarded at this rate, as well. Betsy will recover her costs of suit. Each party will bear its own attorney fees.

---

[14] *See* Pl.'s Ex. 9, pp. 53, 54.

[15] *See* Pl.'s Ex. 14, pp. 1-2. At trial, Kelly stated that all the charges listed on this exhibit appeared to be ones that she had made.

[16] *See* Pl.'s Ex. 2, p. 5.

12

An order and judgment will be entered consistent with this memorandum.

DATED: May 17, 2007.

BY THE COURT

/s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:   W. Satterberg, Jr., Esq. (for plaintiff)
J. Crawford, Esq. (for defendant)
P. Gingras, Adv. Case Manager - √ svd 5/17/07 - aam

05/17/07